## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:13-cv-02394-WYD-MEH

MALIBU MEDIA, LLC,

Plaintiff,

v.

JEREMIAH BENSON,

Defendant.

_____

### DEFENDANT'S FIRST SET OF INTERROGATORIES, REQUEST FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSIONS TO PLAINTIFF

_____

DEFENDANT, through his attorney, David S. Kerr submit the following interrogatories, request for production of documents, and request for admissions to Plaintiff MALIBU MEDIA pursuant to Fed R. Civ. Pro. 33, 34, and 36.

### <u>INSTRUCTIONS</u>

1. These are general instructions. For time limitations, requirements for service on other parties, and other details, see F.R.C.P. 16, 26, 33, 34, 36, and the cases construing those Rules.

2. Within thirty (30) days after you are served with these interrogatories and requests for production, you must serve your responses on the asking party.

3. Each answer must be as complete and straightforward as the information reasonably available to you permits. If a discovery request cannot be answered completely, answer it to the extent possible.

4. Whenever a discovery request may be answered by referring to a document, the document may be attached as an exhibit to the response and referred to in the response. If the document has more than one page, refer to the page and section where the answer to the discovery request can be found.

1

5. Whenever an address and telephone number for the same person are requested in more than one discovery request, you are required to furnish them in answering only the first discovery request seeking that information.

6. These discovery requests are continuing. If any information sought by these is not discovered or learned until after they are answered, or if answers for any reason should later become incorrect, there shall be a continuing duty on the party answering these discovery requests to supplement or change answers previously submitted pursuant to F.R.C.P. 26(e), and applicable case law. If any discovery request cannot be answered in full, an answer shall be given to the greatest extent possible.

7. If refusal to answer a question is based on the grounds of burdensomeness, identify the number and nature of documents needed to be searched, the location of the documents, and the number of persons, hours and costs required to conduct the search.

<u>DEFINITIONS</u>

1. "DOCUMENT(S)" means the original or exact copies of any written, printed, typed, recorded, or other graphic matter of any kind or nature, and all mechanical and electrical recordings and any transcripts thereof, draft, final, original, reproduced, signed or unsigned, regardless of whether approved, signed, sent, received, redrafted, or executed, computer data files, electronically stored information ("ESI") in the possession, custody, and/or control of Plaintiff or Plaintiffs agents and counsel or may through reasonable efforts be obtained of Plaintiffs agents and counsel, or known by Plaintiff to exist; it shall also mean all copies of documents by whatever means made. "DOCUMENT(S)" includes all attachments and enclosures thereto including, but not limited to any correspondence, notes, agreements, lists, memoranda, minutes, records, instruments, publications, reports, books, pamphlets, summaries, drafts, calendars, communications, telegrams, facsimiles, emails, manuals, guidelines, rules, instructions, electronic tapes, discs or other recordings, computer programs, hard drives, discs, printouts, data cards, computer files, back-up tapes, hard disks, litigation data bases, and other data compilations from which information can be obtained.

2. "YOU" or "YOUR" means Plaintiff, or Malibu Media, LLC, or X-Art.com, Colette Field and Brigham Field.

3. "PLAINTIFF" or "MALIBU MEDIA" or "X-Art.com" includes Colette Field and Brigham Field as well as all employees, agents, servants, subsidiaries, parent company, affiliated company, officers, board members, and any other person or entity acting or purporting to act on its behalf or under its control.

4. "IDENTIFY" ( 1) when used in reference to a natural person, means that person's full name, last known address, home and business telephone numbers, email address, and present occupation or business affiliation and (2) when used in reference to a person other than a natural person, means that person's full name, a description of the nature of the person (that is, whether it is a corporation, partnership, etc. under the definition of person below), and the person's last known address,

telephone number, and principal place of business; and (3) when used in reference to something as opposed to someone, means to provide all facts, evidence, information, and data in response.

5. "PERSON" includes a natural person, company, firm, association, organization, partnership, business, trust, board, limited liability company, corporation, or other Local, State or Federal entity.

6. "RELATES TO", "RELATING TO" and "RELATED TO" or "CONCERNING" means describing, discussing, evidencing, reflecting, compromising, illustrating, containing, embodying, constituting, analyzing, stating, identifying, referring to, commenting on, connected with, substantiating, establishing, memorializing, proving, disproving, contradicting, mentioning, regarding, reflecting, dealing with, in any way pertaining to, or supporting, directly or indirectly.

7. "COMMUNICATION(S)" means all correspondence, inquiries, discussions, conferences, conversations, negotiations, agreements, meetings, notes, emails, telegrams, telexes, facsimiles, social media posts or comments, other forms of communicating or transmitting information, including, but not limited to, oral, digital, and written COMMUNICATIONS and includes DOCUMENTS exchanged in relation to such COMMUNICATIONS.

8. "ISP" means the Internet Service Provider who identified the IP address 76.25.62.43 as having been assigned to Defendant. ISP also means the Internet Service Provider who provided any identifying information to YOU regarding any other IP addresses allegedly involved in the downloading/uploading of each of YOUR works listed on Exhibits A and/or B, attached to the Amended Complaint.

10. "YOUR WORKS" or "WORK(S)" means the movies as listed in Exhibits A and/or B attached to the Amended Complaint as well as any movie created by you that has been subject to any copyright enforcement proceeding in Colorado.

11. "IPP" means IPP International UG, also known as IPP Limited, and includes all employees, agents, servants, subsidiaries, parent company, affiliated company, officers, board members, and any other person or entity acting or purporting to act on its behalf or under its control.

12. "EXCIPIO" means Excipio GmbH, and includes all employees, agents, servants, subsidiaries, parent company, affiliated company, officers, board members, and any other person or entity acting or purporting to act on its behalf or under its control.

13. "BITTORRENT SITE" means any protocol, web site, web page, internet site, file sharing site, peer-to-peer, or similar file distribution network.

14. "AGREEMENT" means any employment, retainer, fee, data collection services, financial services, services, maintenance, or other agreement, whether oral or written between any parties.

15. With respect to any request to which any privilege is asserted, in whole or in part, please state the exact privilege that is being asserted, identify the nature and substance of the applicable document, and provide the factual basis for the assertion of the privilege in an appropriate privilege log.

<u>REQUESTS FOR PRODUCTION OF DOCUMENTS</u>

1. Produce all communications between IPP and you, including communications by or through any representative or other person.

2. Produce all communications  between EXCIPIO and you, including communications by or through any representative or other person.

3. Produce all communications between any BitTorrent tracking firm and you, including communications by or through any representative or other person.

4. Produce the flat fee agreement between IPP and you.

5. Produce all documents and communications concerning the oral contingency agreement between IPP and you or through any representative or other person.

6. Produce all documents and communications concerning any oral contingency agreement related to enforcement of copyright infringement between any third party and you or through any representative or other person..

7. Produce all documents and communications concerning any contingency agreement related to enforcement of your copyright between any third party and you.

8. Produce all documents that reference, discuss, analyze or identify any issues with INTERNATIONAL IPTRACKER v 1.5 and all "related technology" used by IPP and/or EXCIPIO to identify IP address 76.25.62.43 as infringing on Plaintiffs copyrights, including but not limited to the error codes, modifications to the source code, and prior versions.

9. Produce and identify any agreement between you and any third party concerning copyright enforcement, including but not limited to, IPP, EXCIPIO, Tobias Fieser, Patrick Page, and Michael Patzer.

10. Produce all documents between IPP and you related to IP address 76.25.62.43 or the Defendant.

11. Produce all documents between EXCIPIO and you related to IP address 76.25.62.43 or the Defendant.

12. Produce all documents and related communication, including but not limited to, all Digital Millennium Copyright Act ("DMCA") takedown notices, sent to every BitTorrent site by you referencing your works.

13. Produce all documents and related communications, concerning all non-litigation efforts to enforce copyright of your works and/or mitigate copyright losses.

14. Produce all documents and related communications, concerning any efforts by you to mark, such as with a "watermark" or other identifying information, including all technical and/or financial feasibility research or evaluations.

15. Produce all documents showing any copyright notice affixed to each of your works.

16. Produce "original copies of the movies and copies reassembled from the pieces sent by the peer infringers" as listed in your Fed. R. Civ. P. 26 Disclosures.

17. Produce all documents showing you corporate status, filings, and business licenses, including permits to film for all of your works.

18. Produce all documents concerning any of your works that were filmed at the home of Brigham Field and/or Colette Field.

19. Produce all documents concerning any of your works that were filmed at the home of Brigham Field and/or Colette Field that depicted sexual acts without a condom.

20. Produce all documents concerning compliance with and/or violations of Chapter 10 of Division 4 of the Ventura County Ordinance entitled: Safer Sex in the Adult Film Industry, including removal of any identifying location tags on your works or the website X-Art.com including the dates of removal.

21. Produce all documents concerning compliance with and/or violations of California Code of Regulations Title 8, Section 5193.

22. Produce all documents concerning violations of, or compliance with any state, federal or local municipal law/codes related to your works.

23. Produce all documents and related communication between you and all past and present board members, employees, officers of Malibu Media since 2012 through the present regarding enforcement of you copyright interests, including email, but not limited to communications between Colette and Brigham field whether through professional or personal emails.

24. Produce all documents and related communication between you and all past and present board members, employees, officers of X-ART.COM since 2012 through the present regarding enforcement of you copyright interests including, but not limited to email communications between Colette and Brigham field whether through professional or personal emails.

25. Produce all documents and related communication between you and any third person since 2012 through the present regarding enforcement of you copyright interests, BitTorrent,

copyright enforcement, making sure to include all electronic communications sent through personal or official work emails.

26. Produce all documents for each person, employee, actor, model, and/or on screen participant in each of your works, including but not limited to, drafts payable to each person, payroll information, contact information (street address, telephone number, and email address), and Internal Revenue Service Forms 1099 and W-2, and other information as required by 18 U.S.C. § 2257 as of the date of filming of each of your works.

27. Produce all documents for each person, employee, actor, model, and/or on screen participant in each of your works obtain and/or stored pursuant to 18 U.S.C. § 2257 obtained or recorded after the date of filming of each of your works.

28. Produce all documents concerning internal procedures to obtain, record and store all information required pursuant to 18 U.S.C. § 2257, including all research and communications with any third party regarding compliance with 18 U.S.C. § 2257.

29. Produce all agreements with any third party, including other websites, such as streaming or tube sites and the like, that host and/or display your works or any work produced by Malibu Media and/or X-Art.com.

30. Produce all documents and communications concerning compliance with 18 U.S.C. § 2257 with any third party, including other websites, such as streaming or tube sites and the like, that host and/or display your works or any work produced by Malibu Media and/or X-Art.com

31. Produce all documents concerning procedures implemented by you to ensure that any third party, including other websites, such as streaming or tube sites and the like, that host and/or display your works or any work produced by Malibu Media and/or X-Art.com are compliant with 18 U.S.C. § 2257.

32. Produce all documents and communications concerning your decision not to place notices pursuant to 18 U.S.C. § 2257  at the beginning or end of your works.

33. Produce all documents and communications concerning compliance with, or violations of any work visa that you help in obtaining for an foreign participant in your works.

34. Produce all work visa documents for every foreign participant in your works.

35. Produce all documents identifying each BitTorrent through which IP address 76.25.62.43 is alleged to have accessed your works or any other file.

36. Produce any and all documents, writings, or computer records of any nature that may be used by plaintiff as an exhibit or otherwise at any trial or hearing in this matter.

37. Produce all documents identifying each IP address that participated in each swarm during which you or IPP or EXCIPIO identified IP address 76.25.62.43 as downloading and/or uploading your works.

38. All documents confirming and/or refuting any facts that the Declaration Tobias Feiser submitted in support of Ex Parte Discovery contradicts any other declaration submitted to any Court by him or Michael Patzer.

39. Produce all documents concerning Michael Patzer's relationship with Copyright Defenders.

40. Produce all documents in support of all settlement funds or amounts received for your works, from all participants in each swarm in which you or IPP or EXCIPIO identified IP address 76.25.62.43 as one of those participants.

41. Produce all documents that support this statement: "As previously stated, revenues from subscriptions to X-Art.com are by far and away the dominant driver of Malibu Media's business." *See ¶ 31 of undated Declaration of Colette Field*.

42. Produce all documents related to or supporting the allegation made by you that "proven IP address geolocation technology which has consistently worked in similar cases to ensure that the Defendant's act of copyright infringement occurred using an Internet Protocol address ("IP address") traced to a physical address located within this District."

43. Produce all documents in support of the allegation that "Defendant's IP address as set forth on Exhibit A was used to illegally distribute each of the copyrighted movies set forth on Exhibit B." *See Amended Complaint,* at ¶ 2.

44. Produce all non-privileged documents concerning your directions to counsel and other public statements by you as to how you determine if someone is a persistent online infringer, how a settlement amount is determined and what personal hardship considerations are considered.

45. Produce all non-privileged documents concerning actions by counsel that did not follow the directions provided by you in request No. 44.

46. Produce all documents concerning how many BitTorrent swarms you, IPP or Excipo are currently monitoring.

47. Produce all documents concerning the complete chain of evidence regarding the infringements alleged against the Defendant including IPP, Excipio, you and any other third party.

48. Produce all documents concerning any person's employed by, or contacted by you to collects settlements related to the infringement of your works, including identification those individuals, whether compensation was at any time contingency on any settlement amount as well as the acceptance of exculpatory evidence.

49. Produce all documents concerning any polygraph test you have conducted.

50. Produce all documents concerning any miscorrelation by any ISP related to an IP address you alleged had downloaded your works.

51. Produce all documents evidencing any reduction or increase of the level of BitTorrenting of your works.

52. Produce all documents evidencing any reduction or increase of the level of BitTorrenting of your works by persons allegedly located in Colorado.

53. Identify each copyright lawsuit where it was determined that the Plaintiff that was originally sued did not, in fact or to the best of your belief download any of your works, including how many of those were dismissed.

54. Produce the forensic software named INTERNATIONAL IPTRACKER v 1.5 and all "related technology" used by IPP and/or EXCIPIO to identify IP address 76.25.62.43 as infringing on Plaintiffs copyrights.

55. Produce all documents that show what your internet subscription revenue is compared to your recovery or settlement funds in litigation, including but not limited to, Federal and State income tax returns, bank account information, corporate revenue statements, profit sharing, for every year since you internet subscription website X-Art.com was started.

56. All documents supporting your contention that it is "getting more difficult for us every day" from the following statements: "In conclusion, we want the courts to know that we are a small business and we need the law to be enforced to ensure our survival. It is getting more difficult for us every day ... " *See ¶ 33 of undated Declaration of Colelle Field*

57. Produce any and all documents, writings, or computer records of any nature that identify how IPP used any online media distribution system as referenced in its declarations submitted to the Court.

58. Produce any and all documents concerning all amounts have you paid to IPP, EXCIPIO, Tobias Fieser, Michael Patzer, Patrick Page, and any other third party retained in this case.

59. With regard to Tobias Feiser please attach a copy of his current curriculum vitae or resume. In the alternative, please state his educational and vocational background or the training in the matter to which they his testify, describing all qualifications.

60. With regard to Patrick Page please attach a copy of his current curriculum vitae or resume. In the alternative, please state his educational and vocational background or the training in the matter to which they his testify, describing all qualifications including any pending civil or criminal charges or allegations, specifically related to possession and use of narcotics.

61. With regard to Michael Patzer please attach a copy of his current curriculum vitae or resume. In the alternative, please state his educational and vocational background or the training in the matter to which they his testify, describing all qualifications.

8

62. All licensing agreements, assignments or other documentation by and between the works identified in the expanded surveillance report attachment to your compliant and demonstrating that such Plaintiff its agents and/or representatives were authorized to upload and/or download the copyrighted material of other third party entities.

63. All license, and/or assignment agreements concerning your works.

64. All subscriber terms of service for X-Art or any other website owned, controlled or maintained by you.

65. All documents, things, and/or electronically stored information, including emails, phone records, recordings, text messages, correspondence or other communications between or among you and any person pertaining to any file sharing downloading technology.

66. All documents pertaining to any electronic correspondence by you including all social network postings, chat room comments that concerns copyright infringement or enforcement of you work or copyright enforcement policies.

67. All documents concerning solicitations sent to you by any third party regarding enforcement of copyrights, including offers and/or solicitations to assist you in enforcing copyrights of any of your content.

68. All financial, asset and/or credit searches or other background or internet searches conduct by you or by any third party on Defendant.

69. All documents, things, and/or electronically stored information arising regarding where and/or how the Work(s) at any time since their creation be accessed, copied, and/or downloaded by any person including authorized 3rd party hosts or partners including if the works were offered for free.

70. All documents, things, and/or electronically stored information relating to any communications relating to any formal or informal ethics complaint, admonishment by any Court, sanctions or threatened sanction by any Court against you, your attorneys and/or agents.

71. All documents, things, and/or electronically stored information relating to indemnification or cost-sharing agreement related to the enforcement of your works.

72. All documents, things, and/or electronically stored information relating to any digital media that you have downloaded, viewed or accessed without authorization of its creators since 2012.

73. All documents, things, and/or electronically stored information relating to any digital media that you have downloaded using a BitTorrent or other peer-to-peer without authorization of the creators since 2012.

74. All documents concerning public admissions by you, including Colette and Brigham Filed that they have ever downloaded, viewed or accessed copyrighted material without authorization of its creators.

75. All documents, things, and/or electronically stored information relating to any digital media that you have legally or with authorization downloaded using a BitTorrent program since 2012.

76. All communications between you and Adam Curry concerning copyright infringement lawsuits and/or enforcement.

77. All communications by you with Adam Curry regarding statements made by Mr. Curry on the May 17, 2012, podcast "No Agenda" concerning statements made to him by Brigham Field concerning copyright infringement lawsuits and/or enforcement.

78. Produce and identify all documents, things, and/or electronically stored information that support or refute any claims or defenses in this case.

79. Produce and identify all documents sufficient to identify all computer programs used on any internet accessible computer devices that you, Colette Field and/or Brigham Field have possessed in the last 24 months.

## <u>INTERROGATORIES</u>

1. State the full name, address and position relative to the Plaintiff of the person(s) answering these Interrogatories and for each such person state what that person contributed.

2. Identify each copyrighted file or work that you, including Colette and/or Brigham has ever downloaded, accessed, streamed and/or distributed without authorization of the creator and indicate the method or program with which it was downloaded as well as the approximate dates it was downloaded.

3. Explain in detail the contradictions between the declaration and/or report submitted by Patrick Paige and the Declaration of Devine Neville regarding the destruction of evidence in Case No. 1:13-cv-00205-WTL-MJD U.S. District Court for the Southern District of Indiana.

4. Explain and identify all efforts by you, or any third party on your behalf to comply and implement your litigation hold obligations to prevent the spoliation of documents and/or deletion of electronically stored information.

5. Explain and describe all procedures established by you for managing the copyright enforcement lawsuits brought by you, including the approximate time spent each day, week, and year by each employee, officer and/or director dealing with copyright enforcement lawsuit related activities, including the approximate number of communications with counsel each day, week, and year, as well as identifying all tasks expressly delegated to your counsel.

6. Explain all efforts by you comply with 18 U.S.C. § 2257, Chapter 10 of Division 4 of the Ventura County Ordinance entitled: Safer Sex in the Adult Film Industry, California Code of Regulations Title 8, Section 5193, US work VISA regulations including all instances of non-compliance with the same as well as all efforts to ensure any third party distributors or sponsors of your works are compliant, again identifying all instances of non-compliance.

7. Describe how it is "getting more difficult for us every day" from the following statements: "In conclusion, we want the courts to know that we are a small business and we need the law to be enforced to ensure our survival. It is getting more difficult for us everyday ..." *See ¶33 of undated Declaration of Colette Field.* Included in your response should be a summary of the year-to-year growth in gross and net revenues, costs, subscriptions, as well as the income or benefit Colette and Brigham Field have derived from Malibu Media and/or X-Art.com from its inception including all losses you have suffered as a result of copyright enforcement.

11

8.  What is your internet subscription revenue compared to your recovery of settlement funds in litigation for every year since YOUR internet subscription website XArt.com was started?

9.  Identify all persons or business entities that have an interest, whether financial or otherwise, in this litigation of any copyright lawsuit brought in Colorado, including, but not limited to, owners or members of MALIBU MEDIA, X-ART.COM, Counsel for MALIBU MEDIA, forensic consultants, forensic witnesses, investigators, IPP, EXCIPIO, and specifically and in detail describe the nature of the interest and if that interest has changed over time.

10. Identify every bit "of the digital movie files identified by the file hashes on Exhibit A," downloaded by IPP International UG from Defendant, as alleged in the Amended Complaint. In this response, include how many of the total bits of the entire digital movie file were downloaded, as well as the total number of bits in the entire digital move file, for each of your works.

11. Explain in detail every physical and/or electronic step you, or someone on your behalf identified any use of Defendant's IP address, including the chain of custody of all records and their current location for every one of your works or any other extended surveillance.

12. Describe all accuracy testing protocols and errors in the forensic software named INTERNATIONAL IPTRACKER v 1.5 or other software used by IPP and/or EXCIPIO.

13. List each and every past and pending lawsuit brought by you or on your behalf which included any of the File Hash or Hash Numbers as listed in Exhibit A to the Amended Complaint.

14. Provide the amount of money received in settlement for each of your works from all participants in each swarm in which Defendant's IP address is alleged to have participated.

15. Identify and describe all information on everyone involved in each swarm for your works, including, but not limited to IP addresses, location of each IP address, BitTorrent Sites used, and any information you were provided by the ISP.

16. Describe all efforts, *i.e.,* what "resources" you "invest", made by you as to your works, as contained in the following statement: "We invest significant resources into pursuing all types of anti-piracy enforcement, such as Digital Millennium Copyright Act ("DMCA") takedown notices and direct efforts aimed at infringing websites." *See ¶27 of undated Declaration of Colette Field.*

17. Describe everything you or anyone on your behalf does to verify your subscribers comply with the following Legal Statement from X-ART.COM website: "Subscribers of the

website are hereby granted a single copy license to download one copy of the Content for their personal, private and non-commercial use only."

18. Describe your oral agreement with IPP, wherein IPP was paid a small portion of the amount received from a settlement or judgment from your litigation, including who discussed all terms of this oral agreement, when it was entered into, when it will expire or if it has expired and if so why, and how the "small portion" is or was determined and when those terms were disclosed to, and/or approved by you.

19. Explain and identify each and every instance where you brought a lawsuit for copyright infringement against an individual(s) and discovered, and/or decided that that person did not download your works, including the name or Doe identifier, case number, works and hash numbers allegedly downloaded, how you came to the conclusion that the person did not download your works, the evidence that lead to this discovery and/or decision, and your actions upon making this discovery.

20. Explain and identify with specificity all costs typically incurred by you to prosecute a copyright infringement case in Colorado such as the instant case, including the average settlement derived from a typical copyright infringement case in Colorado.

## REQUESTS FOR ADMISSION

1.    Admit that you derive a net profit from the enforcement of your copyrights.

2.    Admit that an IP address does not directly correlate with any person or entity, other than the Subscriber, or person who opened – and pays the bills for – the account associates with an internet service provider.

3.    Admit that Colette Field has a channel on xvideos.com that features X-Art videos for free.

4.    Admit that Colette Field has a channel on xvideos.com that features X-Art videos for free and that xvideos.com does not have any records of notification for these works pursuant to 18 U.S.C. § 2257.

5.    Admit that Colette Field has a channel on xvideos.com that features X-Art videos for free and that these videos do not have a notification for these works pursuant to 18 U.S.C. § 2257 at the beginning or end of the credits.

6.    Admit that you distribute your works through pornhub.com for free.

7.    Admit that you distribute your works through pornhub.com for free and that pornhub.com does not have any records of notification for these works pursuant to 18 U.S.C. § 2257.

8.    Admit that you distribute your works through pornhub.com for free and that these videos do not have a notification pursuant to 18 U.S.C. § 2257 at the beginning or end of the credits.

9.    Admit that you distribute your works through third party websites for free.

10.   Admit that you distribute your works through third party websites for free and that third party websites do not have any records of notification for these works pursuant to 18 U.S.C. § 2257.

11.   Admit that you distribute your works through third party websites for free and that these videos do not have a notification pursuant to 18 U.S.C. § 2257 at the beginning or end of the credits.

12.   Admit that IP addresses are commonly shared by subscribers to internet access by means of local area networks, with multiple individuals accessing the internet by use of that IP address.

13.   Admit that Colette Field has used a private wireless network that was open to access the internet.

14.   Admit that Brigham Field has used a private wireless network that was open to access the internet.

15.   Admit that Colette Field has used a private wireless network that was open to access pornographic material.

16.   Admit that Brigham Field has used a private wireless network that was open to access to access pornographic material.

17.   Admit that Colette Field has used a private wireless network that was open to access pornographic material without the authorization of the content's creator.

18.   Admit that Brigham Field has used a private wireless network that was open to access to access pornographic material without the authorization of the content's creator.

19.   Admit that Colette Field has previously downloaded pornographic material without the authorization of the content's creator.

20.   Admit that Brigham Field has previously downloaded pornographic material without the authorization of the content's creator.

21.   Admit that Colette Field has previously downloaded pornographic material without the authorization of the content's creator through a BitTorrent or other peer-to-peer program.

22.   Admit that Brigham Field has previously downloaded pornographic material without the authorization of the content's creator through a BitTorrent or other peer-to-peer program.

23.   Admit that Colette Field has previously downloaded digital media, such as music without the authorization of the content's creator.

24.   Admit that Brigham Field has previously downloaded digital media, such as music without the authorization of the content's creator.

25.   Admit that Colette Field has previously downloaded digital media, such as music without the authorization of the content's creator through a BitTorrent or other peer-to-peer program.

26.   Admit that Brigham Field has previously downloaded digital media, such as music without the authorization of the content's creator through a BitTorrent or other peer-to-peer program.

27.   Admit that Colette Field and Brigham Field prior to founding x-art.com were struggling financially.

28.   Admit that you are not aware of any person that you have sued that has later became a subscribing customer of X-Art.com.

29.   Admit that you have lost subscribers as a result of your copyright enforcement policies.

30.   Admit that the total revenue lost by a loss in subscriptions as a result of your copyright enforcement policies is less than the total gain to you from settlement funds.

31.   Admit that Colette Field and Brigham Field's current net worth is in the millions of dollars.

32.   Admit that Colette Field posted on the internet that she had illegally downloading music when she was younger.

33.   Admit that at that time paying $2,250 per song she downloaded would have caused Colette Field, and her family financial hardship.

34.   Admit that prior to founding X-art.com paying $2,250 per song would have caused Colette Field, and her family financial hardship.

35.   Admit that based on her present financial position paying $2,250 per song she downloaded would have caused Colette Field, and her family no financial hardship.

36.   Admit that you have filmed sexually explicit activities for commercial distribution at the home of Brigham Field and/or Colette Field.

37.   Admit that the home of Brigham Field and/or Colette Field is in an area zoned for residential housing.

38.   Admit that a permit is required to commercially film sexually explicit activities in the home of Brigham Field and/or Colette Field.

39.   Admit that you did not obtain a permit to commercially film sexually explicit activities in the home of Brigham Field and/or Colette Field.

40.   Admit that you filmed one or more of the works at issue in this case at the home of Brigham Field and/or Colette Field.

41.   Admit that you filmed sexually explicit activities for commercial distribution at the home of Brigham Field and/or Colette Field where the participants did not use a condom.

42.   Admit that the home of Brigham Field and/or Colette Field is located in Ventura County California.

43.   Admit that you filmed one or more of the works at issues in this case at the home of Brigham Field and/or Colette Field where the participants did not use a condom.

44.   Admit that you removed identifying location tags on your website that indicted the locations of one or more of your works were filmed in Ventura county within the last 6 months.

45.   Admit that you have violated one or more foreign work visa regulations for foreign participants in one or more of your works.

46.   Admit that you record and store all records mandated by 18 U.S.C. § 2257 in-house.

47.  Admit that you are not currently compliant with 18 U.S.C. § 2257.

48.  Admit that in the past you have not been compliant with 18 U.S.C. § 2257.

49.  Admit that one or more of your works feature participants younger than 18.

50.  Admit that it is possible that one or more of your works feature participants younger than 18.

51.  Admit that you are not compliant with 18 U.S.C. § 2257 for at least one of the Works at issue in this case.

52.  Admit that you have falsified 18 U.S.C. § 2257 records.

53.  Admit that you have falsified 18 U.S.C. § 2257 records for foreign participants in one or more of your works.

54.  Admit that you do not place 18 U.S.C. § 2257 notification at the beginning or/and of your works.

55.  Admit that you and/or x-art or any of its affiliates maintain sponsored channels or content on third party websites, such as PornHub or xvideos without any contractual provisions accounting for 18 U.S.C. § 2257 record keeping and/or notices.

56.  Admit that Colette Field has publically stated: "If you want to live in the United States you must abide by the laws of this country, no more, no less."

57.  Admit that you are aware that Patrick Paige was charged for possession of a controlled substance without a prescription.

58.  Admit that you entered into an oral contingency agreement with IPP.

59.  Admit that this agreement was negotiated by Keith Lipscomb.

60.  Admit that you did not enter into a flat rate fee arrangement with IPP until after admitting in other discovery requests in another case the existence of the oral contingency agreement negotiated by Keith Lipscomb.

61.  Admit that running Malibu Media is a demanding job requiring Colette and Brigham Field to work in excess of 40 hours a week and travel extensively.

62.  Admit that running Malibu Media is a demanding job requiring Colette and Brigham Field to work approximately 60 hours a week.

63.  Admit that running Malibu Media is a demanding job requiring Colette and Brigham Field to work approximately 80 hours a week.

64.   Admit that you have taken step to avoid being deposed under oath by any adverse party.

65.   Admit that you have taken step to avoid discovery submitted by any adverse party.

66.   Admit that you have not placed a litigation hold on your business and personal electronic and other records to prevent the spoliation of evidence.

67.   Admit that Keith Lipscomb contacted and recruited all current local attorneys working on infringement cases for you.

68.   Admit that infringement of your works has not gone down since you began filing copyright infringement lawsuits.

69.   Admit that since the founding of X-Art there have been a number of copycat or comparable sites that offer similar "beautiful erotica" films and pictorials.

70.   Admit that your copyright infringement policies have resulted in negative publicity for X-art.

71.   Admit that your Colorado copyright infringement counsel earn a greater share of settlement funds than you do.

72.   Admit that Keith Lipscomb earns a greater share of settlement funds than you do.

73.   Admit that under the prior oral contingency fee agreement IPP earned a greater share of settlement funds than you did.

74.   Admit that your copyright infringement policies have resulted in negative publicity for Colette Field.

75.   Admit that your copyright infringement policies have resulted in negative publicity for Brigham Field.

76.   Admit that you would rather have paying subscribers than sue people for infringement.

77.   Admit that it is possible you have received settlement money from innocent individual that settled rather than bear the expense of a defense.

78.   Admit that it is possible you have received settlement money from innocent individual that settled rather than bear the embarrassment of proceeding with the lawsuit.

79.   Admit that you pay all of your attorneys on contingency.

80.   Admit that you have provided false discovery responses to this Court the past.

81. Admit that the declaration of Tobias Feiser submitted in support of Ex Parte contradicts with the declaration of Michael Patzer submitted in Plaintiff's response to the Defendant's Motion to Exclude Evidence.

82. Admit that the statements made by Mr. Adam Curry on the May 17, 2012 podcast "No Agenda" concerning conversations/statements made to him by Brigham Field concerning copyright infringement lawsuits and/or enforcement occurred.

83. Admit that the statements made by Mr. Adam Curry on the May 17, 2012 podcast "No Agenda" concerning conversations/statements made to him by Brigham Field concerning copyright infringement lawsuits and/or enforcement occurred and that Brigham Field indicated that you only received 10% of settlement funds.

84. Admit that Malibu Media cannot differentiate between a public and private IP address.

85. Admit that IPP or cannot differentiate between a public and private IP address.

86. Admit that Excipio cannot differentiate between a public and private IP address.

87. Admit that it is possible that the Defendant's IP address was incorrectly transferred from Plaintiff by IPP or Excipio.

88. Admit that it is possible that the Defendant's IP address was incorrectly transferred from the ISP to Plaintiff or Plaintiff's counsel.

89. Admit that it is possible that the Defendant's IP address was incorrectly transferred to Plaintiff by IPP or Excipio.

90. Admit that it is possible that the Defendant's IP address was incorrectly listed by Plaintiff in its Complaint.

91. Admit that it is possible that the Defendant's IP address was incorrectly identified by the technology used by IPP Ltd.

92. Admit that it is possible that the Defendant's IP address was incorrectly recorded by the technology used by IPP Ltd.

93. Admit that it is IP address does not identify a person, but rather, a device.

94. Admit that it is IP address cannot identify a person who committed a volitional act of copying through a Bittorrent protocol.

95. Admit that an unsecured wireless internet network can be accessed by any device capable of wireless internet access which is within its range.

96.  Admit that it is possible to access an unsecured wireless internet network without the knowledge of the individual who has set up the network and paid for internet service.

97.  Admit that Defendant is not required by his ISP to maintain a secured wireless signal.

98.  Admit that Plaintiff is not aware of any law and/or legal duty that would require the Defendant to maintain a secured wireless signal.

99.  Admit that when a computer connects to the Internet using a modem and/or a router serving as a network translation device (NAT), a computer's internal IP address is not visible once information passes through the NAT.

100.  Admit that when a person connects to the Internet using a modem or router that acts as a network translation device (NAT), any information transmitted or received by the NAT to the Internet would appear to be from the IP address assigned to the NAT by the ISP.

101.  Admit that it is possible that someone other than Defendant downloaded the Work(s) by accessing Defendant's wireless network without his knowledge, authorization or consent.

102.  Admit that you have never been deposed by an adverse party in any copyright infringement case.

103.  Admit that you have never been cross-examined by an adverse party in any copyright infringement case.

104.  Admit that you would not have time to run Malibu Media and/or X-art if you were required to be deposed in every lawsuit you brought around the country.

105.  Admit that you would not have time to run Malibu Media and/or X-art if were required to testify in every lawsuit you brought.

106.  Admit that Defendant offered you unfettered access to his at the beginning of the case prior to discovery.

107.  Admit that you refused Defendant's offer of unfettered access to his computers at the beginning of the case prior to discovery.

108.  Admit that Defendant offered you unfettered access to his home at the beginning of the case prior to discovery.

109.  Admit that you refused Defendant's offer of unfettered access to his home at the beginning of the case prior to discovery.

110.  Admit that Defendant offered you unfettered access to his wireless router at the beginning of the case prior to discovery.

111. Admit that you refused Defendant's offer of unfettered access to his wireless router at the beginning of the case prior to discovery.

112. Admit that Defendant offered to allow you to depose him under oath at the beginning of the case prior to discovery.

113. Admit that you refused Defendant's offer to allow you to depose him under oath at the beginning of the case prior to discovery.

114. Admit that Defendant offered to allow you to depose his wife under oath at the beginning of the case prior to discovery.

115. Admit that you refused Defendant's offer to allow you to depose his wife under oath at the beginning of the case prior to discovery.

116. You have never deposed any copyright infringement Defendant or potential defendant in Colorado.

117. You have never inspected the computer of any copyright infringement Defendant or potential defendant in Colorado.

118. You have never inspected the router of any copyright infringement Defendant or potential defendant in Colorado

119. Admit that you, specifically including Colette Field has made public and sworn statements under oath that you do not want to cause economic harm to anyone.

120. Admit you demanded a $1500 settlement from a disabled Colorado resident who was alleged to have downloaded one or more of your works even after he demonstrated with documentary evidence his monthly income of approximately $800 provided by the Social Security Disability Administration.

121. Admit polygraph test result are not admissible in Colorado Courts.

122. Admit that an innocent person can fail a polygraph.

123. Admit that an guilty or liable person can pass a polygraph.

124. Admit that regardless of whether a potential Defendant is innocent, if he/she fails a polygraph test you will demand a higher settlement number.

125. Admit that regardless of whether a potential Defendant is innocent, if he/she fails a polygraph test you will be less likely to accept other exculpatory evidence.

126. Admit that regardless of whether a potential Defendant is innocent, if he/she fails a polygraph test you will be less likely to dismiss the case.

127.   Admit that IPP, or Excipio seeded your works through BitTorrent network.

128.   Admit that it is possible that IPP, or Excipio seeded your works through BitTorrent network.

129.   Admit that it there is no way of you knowing if IPP, or Excipio seeded your works through a BitTorrent network other than the word of IPP, or Excipio.

130.   Admit that your attorneys have been sanctioned for inappropriate litigation conduct.

131.   Admit that you have been sanctioned for inappropriate litigation conduct.

132.   Admit that neither you, Colette Field or Brigham Field have any day-to-day involvement in the lawsuits filed by Malibu Media.

133.   Admit that neither you, Colette Field or Brigham Field make decisions regarding individual settlement or settlement amounts.

134.   Admit that the majority of settlement money in the lawsuits filed by Malibu Media is distributed to its counsel and I.P. address trackers such as IPP and Excipio.

135.   Admit that the portion of the settlement or judgment received by counsel increases as additional litigation steps are taken.

136.   Admit that IPP Ltd., uses the same IP tracking technology as Guardaley Ltd.

137.   Admit that Excipio., uses the same IP tracking technology as Guardaley Ltd.

138.   Admit that the Works depict sexual activity.

139.   Admit that the Works depict sexually explicit activity.

140.   Admit that you have demanded financial payment based on you claims for the illegal exchange of copyrighted movies using an online media distribution program from individuals where it could not be established that they had engaged in any violation of the copyright act.

141.   Admit that Plaintiffs demanded financial payment for the illegal exchange of movie owned by Plaintiffs using an online media distribution program from Defendant after obtaining information that he did not engage in the activity alleged in the complaint.

142.   Admit that you have been ordered to pay the attorneys' fee of someone that you have sued for copyright infringement.

143.   Admit that the third-party infringement works in Plaintiff expanded surveillance report did not include information about the unique cryptographic hash values (i.e. digital fingerprint).

144.   Admit that Plaintiff's investigators did not match the information exchanged in the Torrent swarm for the third-party infringement works with the unique cryptographic hash values (i.e. digital fingerprint) of the full digital media copy of the third-party infringement works.

145.   Admit that the idea to file copyright infringement lawsuits against alleged BitTorrent users originally came from a solicitation by a third party.

146.   Admit that you were approached initially by Keith Lipscomb regarding filing copyright infringement lawsuit on behalf of Malibu Media in exchange for a contingency fee.

Respectfully submitted April 14th, 2014.

SANTANGELO LAW OFFICES, P.C.

/s/ David S. Kerr
David S. Kerr
125 South Howes St., 3rd Floor
Fort Collins, CO 80521
Telephone: 970-224-3100
Email: dkerr@idea-asset.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Discovery Requests were served by email on this 14th day of April, 2014, upon the following counsel:


Jason Kotzker
Kotzker Law Group
9609 S University Blvd., #632134
Highlands Ranch, CO 80163
jason@klgip.com


/s/ David S. Kerr