**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:13-cv-02394-WYD-MEH

MALIBU MEDIA, LLC,
Plaintiff,
v.
JEREMIAH BENSON,
Defendant.

_____

**DEFENDANT JEREMIAH BENSON'S RESPONSE**

_____

*This is the most blatant attempt to manufacturer attorneys' fees that undersigned, and likely this Court, has or will ever see.*[1]

<u>INTRODUCTION</u>

Plaintiff, Malibu Media's motion is unfounded in both law and fact. It mischaracterizes or ignores key evidence and communications between counsel. It makes unfounded allegations of a conspiracy between the Defendant, Mr. Benson and his counsel. Most importantly, it omits the most important document at issue in this case. Specifically, the independent third party forensic report conducted on all of Mr. Benson's internet capable devices which unequivocally proves, *inter alia*, that Mr. Benson: 1) <u>never downloaded any of Malibu Media's works</u>; 2) <u>did not destroy or tamper with any evidence</u>; and 3) <u>that no evidence of any program that could have "wiped" evidence from a hard drive was found</u>. (Exhibit A).  Instead of reasonably considering this independent expert evidence, Malibu Media choose to file the instant motion to intimidate Mr. Benson and professionally embarrass and impugn his counsel's reputation. Mr. Benson wishes to enter into the record facts and evidence omitted by Malibu Media to guide this Court's deliberations. Based on this evidence Mr. Benson will demonstrate that Malibu Media's request for sanctions is not supported by the record.

_____

[1] Malibu Media's Memorandum  in Opposition to Defendant's Motion for Attorney's Fees. *Malibu Media v. Maness.* Case No. 1:12-cv-01873 filed 11/23/12.

<u>ARGUMENT</u>

**I.  MALIBU MEDIA FAILED TO MEET AND CONFER**

Malibu Media's counsel failed to confer prior to filing the instant motion justifying dismissal. Specifically, Local Rule 7.1 "requires meaningful negotiations, not simply a message indicating an intent to file a motion, without further explanation or attempt at compromise." *See Asten v. City of Boulder*, 2010 U.S. Dist. LEXIS 137758, at *8 (D. Colo. 2010)(M. Hegarty) citing *Hoelzel v. First Select Corp.*, 214 F.R.D. 634 (2003).

Malibu's counsel emailed the instant motion -- as well as a motion to lift the Court imposed stay -- to Mr. Benson's counsel on Wednesday, July 16th at 2:07 pm. (Exhibit B). Both motions were filed three hours later at 5:08 and 5:09 respectively. The instant Motion for sanctions states that:

> "*Defense counsel informed undersigned counsel that he does not concur with the relief requested herein.*"

(Mot. Certification at 8) Mr. Benson's counsel was conducting a deposition in another matter that day and did not even see this email until late that evening. (Exhibit B). As such, Mr. Benson's counsel could not have "*informed*" Malibu's counsel of anything prior to filing. Contrary to Malibu's  certification, after both motions were filed, Mr. Benson's counsel requested multiple times additional specificity as to Malibu's claims and a desire to engage in an in-person conferral. (*See* Exhibits B, C and D). Specifically, defense counsel requested an itemization of the relief sought, including the hours expended and the work performed to evaluate its reasonableness. (*See Id.*) To date, Malibu's counsel has not attempted to conduct an in-person conferral, nor has it provided the requested breakdown of costs and work performed. This fact alone justifies dismissal. *See Borwick v. T-Mobile W. Corp.*, 2012 U.S. Dist. LEXIS 128968, at *4-5 (D. Colo. 2012)(failure to confer alone is certainly grounds enough to deny the motion.)(M. Hegarty).

## II.  NO AGREEMENT WAS REACHED AT THE SETTLEMENT CONFERENCE

The record demonstrates that the parties did not reach agreement as to the essential terms during the June 16 settlement conference nor any time after. In Colorado, "[i]n order for a settlement to be binding and enforceable, there must be a 'meeting of the minds' as to the terms and conditions of the compromise and settlement." *Hanson v. Portfolio Recovery Assocs., Inc.*, 2013 U.S. Dist. LEXIS 185428, at *4 (D. Colo. 2013) citing *H.W. Houston Constr. Co. v. District Court*, 632 P.2d 563, 565 (Colo. 1981). "[T]he evidence must show that the parties agreed upon all essential terms." *Farmer v. Banco Popular of N. Am.*, 2013 U.S. Dist. LEXIS 69053, at *13 (D. Colo. 2013) citing *I.M.A., Inc. v. Rocky Mountain Airways, Inc.*, 713 P.2d 882, 888 (Colo. 1986). Moreover, a Court cannot impose a settlement "when there was never a meeting of the minds." *Rocky Mt. Mortg. Specialists, Inc. v. First Am. Real Estate Info. Servs.*, 2008 U.S. Dist. LEXIS 123129, at *4 (D. Colo. 2008)(M. Hegarty) citing *Wang Laboratories, Inc. v. Applied Computer Sciences, Inc.*, 958 F.2d 355, 359 (Fed. Cir. 1992).

First, as no written document was created to memorialize the discussions that occurred at the settlement conference, defense counsel emailed Malibu's counsel that same day to confirm the terms of the Agreement. (Exhibit E).[2] The essential terms, as communicated and agreed to by Mr. Benson at a the settlement conference, were summarized as follows:

> "*First, Mr. Benson will undergo a polygraph examination. If he passes, you will file a stipulated dismissal with prejudice signed by both parties. This dismissal will include a statement fully exonerating Mr. Benson as well as an apology from your client. Mr. Benson also retains the option to proceed with a motion for attorney's fees if he desires. If he fails, the results of the polygraph will remain inadmissible for any purpose and considered confidential-attorney's eyes only per the protective order, even if the P.O. has not been filed with the Court. At this point Malibu will pay for a full forensic examination of his computers – which we would actually welcome. Again, if his computers check out and there is no evidence of wiping or other destruction of evidence, you will file a stipulated dismissal with prejudice*

---

[2] By unilaterally disclosing the terms of the Parties confidential settlement communications and further including them in support of a motion for sanctions against Mr. Benson and his counsel, Malibu Media has placed the contents of those communications at issue in this case and waived any confidentiality and/or privilege that may have previously attached.

> *signed by both parties. This dismissal will include a statement fully exonerating Mr. Benson, a copy of the report, as well as an apology from your client. Mr. Benson also retains the option to proceed with a motion for attorney's fees if he desires. The report will be fully admissible for use with Mr. Benson's motion for attorney's fees should he elect to pursue that option*."

(*Id.*) (Aff. Benson ¶ 1) Malibu's counsel, conceding the rushed nature of the conference, responded that:

> "[*The Court*] *never mentioned attaching a forensic report, if evidencing no nefarious activity, to any dismissal document. Nor did he mention Malibu Media having to issue an apology; simply a statement that after investigation it deemed that it did not have sufficient evidence to move forward*."

(*Id.*) This response demonstrates that the essential terms listed above were never communicated to Malibu Media at the settlement conference, let alone agreed to. As a result there could not have been a "meeting of the minds" as to the essential terms. Without these two steps no enforceable settlement agreement was ever formed. Mr. Benson would not have approved any settlement agreement without assurances that Malibu would provide: 1) a specific statement of exoneration on the record; 2) an apology on the record; and 3) inclusion of any computer forensic report on the record. (Aff. Benson ¶ 2).

Second, Malibu's statement that "*i'm [sic]sure we'll be able to come up with some mutually agreeable language if that scenario presents itself*" (Exhibit E), further demonstrates that additional negotiations would be required as to these essential terms. Both this Court and the Tenth Circuit have affirmed that to evidence the formation of final settlement agreement "it must appear that further negotiations are not required to work out important and essential terms." *Joseph Brazier, Ltd. v. Specialty Bar Prods. Co.*, 2009 U.S. Dist. LEXIS 20487, at *7 (D. Colo. 2009) citing *New York Life Ins. Co. v. KN Energy, Inc.*, 80 F.3d 405, 409 (10th Cir. 1996). Both Malibu Media and Mr. Benson participated in the settlement conference in good faith. In retrospect, both Parties could have more promptly sought clarity as to the agreed upon settlement terms or lack

thereof. To the extent this was not done, both Parties come to the Court with blame at their feet, but not "guilty heart[s] and mind[s]."

Third, two days after filing the instant motion, Malibu stated, for the first time, that Mr. Benson further "*breached the settlement agreement by failing to give Plaintiff his computer for inspection.*" (Exhibit D) This term was never discussed. (*See e.g.*, Exhibit E) (Aff. Benson ¶ 4) Malibu never requested Mr. Benson's computers, nor asked to have them inspected by their expert. (*Id.*) More importantly, this "new term" contradicts the instant motion which states:

> "*Passing the polygraph test would have relieved [Mr. Benson] of all liability and ended the case; there would have been no need for him to independently have his hard drives imaged and examined.…[and that Malibu's expert would] "examine the hard drives should that be necessary*."

(Mot. at 6). Mr. Benson, even before he was identified by his Internet Service Provider and named in this case, offered Malibu Media access to every single one of his internet capable devices. (Aff. Benson ¶ 5) Mr. Benson has repeatedly communicated that Malibu is free to conduct its own forensic inspection. (*See* Exhibits F, D and G)[3]

## III.  MR. BENSON'S INDEPENDENT FORENSIC INSPECTION WAS MADE IN GOOD FAITH

The record demonstrates that Mr. Benson's independent forensic inspection was lawful, consistent with the Rules governing discovery, reasonable under the circumstances and not offered for an improper purpose.

First, Mr. Benson is fully within his legal rights to have his family's computer devices forensically inspected at any time. Since the very beginning of this case Mr. Benson's counsel has repeatedly communicated to Malibu Media his desire and intention to have his computers independently inspected. (Aff. Benson ¶ 6 ) Mr. Benson attempted for months to save enough money to accomplish this goal. (*Id.*)  Mr. Benson had to exhaust he and his wife's entire savings

---

[3] Despite multiple offers, Malibu Media has failed to inspect Mr. Benson's computer for nearly 9 months.

and sell many of his own personal belongings just to pay for the forensic inspection at issue. (*Id.*) As a result, Mr. Benson and his wife are destitute and cannot pay their bills. (*Id.*; *see also* Exhibit H) Apart from the hardships necessary to pay for the forensic report, it represents admissible expert evidence consistent with the Federal Rules of Civil Procedure and Evidence. The written report was immediately turned over to opposing counsel pursuant to Rule 26. (*Id.*) These are not the actions of a man with a "guilty heart and mind," but of an honest man trying his best to clear his name.[4]

Second, under the circumstances it was reasonable for Mr. Benson to have his computer devices forensically inspected. Principally, after the June 16 settlement conference, and especially after learning that Malibu Media did not actually agree to his terms, Mr. Benson was genuinely concerned that Malibu Media was not acting in good faith. (Aff. Benson ¶ 7) Mr. Benson understands the accuracy of polygraph examinations to be approximately that of a coin flip. (*Id.*) Mr. Benson's research further indicated that attempts to determine if someone is telling the truth, as opposed to telling a lie, is particularly unreliable. (*Id.*) Mr. Benson's research indicated, and he believed that he had no better than a 50/50 chance to have the results of the polygraph show that he was being truthful as opposed to coming back inconclusive or indicative of dishonesty. (*Id.*) In this respect, even if he submitted to the polygraph, which is still possible, there was a high likelihood that a forensic inspection would be necessary. (*Id.*)

Under the disputed settlement framework, Mr. Benson would then be required to have his computers inspected. While again, Malibu could have done this at any time, this step also carried certain concerns. For example, Mr. Benson is aware that Malibu's expert, Patrick Paige, had allegedly been charged with felony drug possession involving large quantities of prescription drugs

---

[4] This is highlighted by the fact that the cost of the forensic examination is almost identical to the nuisance-value settlement of $3500 that Malibu previously offered Mr. Benson. (Exhibit H)

undermining his character and credibility.[5] (Aff. Benson ¶ 8)  This concern has yet to be adequately addressed by Malibu's counsel. Mr. Benson further had concerns about Mr. Paige's competence and impartiality. (*Id*.) For example, in an identical case pending in the U.S. District Court for the Southern District of Indiana, Mr. Paige's examination report was used to support claims of spoliation of evidence and perjury. However, countervailing expert testimony was presented indicating that Mr. Paige's report was, at best, flawed and incomplete and, at worst, incompetent and intentionally misleading.[6] (*See e.g*., Exhibit I) With this in mind, Mr. Benson, of his own accord elected to proceed with an independent inspection to protect his rights and keep all available options open to him. (Aff. Benson ¶ 8) Mr. Benson, of his own accord, contacted various third party forensic examiners before eventually settling on Forensic Pursuit to conduct the examination. (*Id*.) (Aff. Kerr ¶ 1).

Third, Mr. Benson had additional reasons to obtain his own forensic examination. For example, Mr. Benson:

1. wanted to preserve the evidence on his computer devices since the case had dragged on for over nine (9) months heightening the risk of, for example, an inadvertent drive or other catastrophic failure as well as any other type of unintentional loss of data;

2. wanted to forestall any chance that Malibu Media would attempt to falsify evidence;

3. wanted to prevent any efforts by Malibu Media's expert to generate an incomplete and/or misleading report similar to other nearly identical cases;

4. wanted to provide an independent report of his innocence that he could maintain as part of his personal records;

5. wanted to provide an independent report of his innocence to show his family, friends as well as his current and/or potential future employers;

---

[5]  Mr. Benson would further respectfully assert that being the sole expert for a company that is responsible for over 1/3 of all the copyright cases in the entire US gives rise to at least the appearance of a financial conflict.

[6]  Mr. Benson would note that, similar to the instant case, Malibu's counsel alleges on the record that defendant's counsel lied to the Court and colluded with the Defendant to destroy evidence. (Exhibit I at 1) This pattern of Malibu's litigation behavior should not go unnoticed by the Court.

6. wanted to generate a forensic report that could possibly be entered into the record -- not coincidentally one of the disputed settlement terms – and, which could have been subject to additional negotiations; and

7. wanted to definitively demonstrate to his wife and counsel that he was innocent and did not destroy any evidence.

(*Id*. ¶ 9) The record indicates that Mr. Benson, at all times, acted independently, reasonably, and without any improper purpose.

## IV.  NO UNREASONABLE DELAY OCCURRED

Malibu Media's claim that "[d]efense counsel's actions vexatiously and unreasonably multiplied the proceedings by nearly a month" is not supported by the record. The actual evidence demonstrates that:

1. It is undisputed that the settlement conference occurred on June 16th, 2013. On that same day defense counsel informed Mr. Kotzker that he would be traveling between June 18-22 and would not have any email availability. In reply, Mr. Kotzker indicated that he would also be leaving town July 18th through the 28th. (Exhibit E).

2. Two days later on June 18th, Mr. Kotzker requested available dates from Mr. Benson's counsel. (Exhibit J). Unfortunately, Mr. Kerr was already traveling and did not have access to his email. Mr. Kerr responded when he returned to his office on June 23rd indicating that any time after the 4th of July "should be fine." (*Id*.).

3. Two days later on June 25th, Mr. Kotzker emailed defense counsel with a list of available dates. Those dates were communicated to Mr. Benson who indicated he would have to check his schedule first. (Exhibit K); (Aff. Benson ¶ 11).

4. On July 1st, Mr. Kotzker emailed defense counsel seeking an update on Mr. Benson's status. The next day on July 2nd, Mr. Kerr indicating he had not heard from Mr. Benson and thought he might already be traveling. (Exhibit K)

5. Mr. Benson was traveling and out of contact July 3rd through the 7th visiting family during the Fourth of July weekend. Mr. Kerr had no contact with Mr. Benson until he returned on July 7th. (Aff. Benson ¶ 11).

6. Between July 2nd  and July 7th, defense counsel was retained as an expert witness in a separate matter. As a result, he was required to conduct a review of an entire case file and produce an expert report prior to a June 7 deadline. This efforts required approximately 60 hours of billable time over the course of those six days (~10 hours per day). Mr. Kerr was out of the office the next two days from July 8th – July 9th. (Aff. Kerr ¶ 2).

7. The next day on July 10th, Mr. Benson informed Malibu Media, though counsel, of the results of the independent forensic examination. (Exhibit L)

As demonstrated by the substantiated timeline above, each of the Parties contributed to the twenty-four (24) day delay. Messrs. Benson, Kotzker and Kerr each, at separate times, took extended vacations during the twenty-four (24) day period. Each had work and family obligations during that time that further contributed to the twenty-four (24) day delay. More importantly, the record demonstrates that the Parties were in contact and working to set up the polygraph examination. With the case under a Court ordered stay, Malibu suffered no prejudice and any delays were reasonable. The record contains no support for Malibu's accusation that Mr. Benson and his counsel evaded Malibu's counsel nor "colluded" in any inappropriate behavior.[7]

## V.  MALIBU MEDIA HAS NOT SUFFERED ANY PREJUDICE

Malibu Media's positions have drastically shifted throughout this entire matter. When first informed of the independent forensic report on July 10th, Malibu's counsel merely acknowledged it and asked for a copy. (Aff. Kerr ¶ 3). However, just a few hours later Malibu's new position was that Mr. Benson and defense counsel had conspired together to act in bad faith and that it would file a motion to enforce the alleged settlement agreement. (Exhibit M). Mr. Benson's counsel immediately sought an in-person meet and confer and further drafted a brief Request for a Status Conference to seek the Court's guidance on how best to proceed. (Exhibit N). Malibu asked to postpone the meet and confer and indicated that the Parties could call the Court the following day

---

[7] Malibu's unfounded accusations not only unfairly tarnish the reputation of counsel, but also diminish the standing of the profession and the justice system as a whole. The Colorado Bar Association's Statement on Principles of Professionalism admonishes that:

> 12.1 [Counsel] will not impute improper motives to other lawyers or make any statements that impugn their character unless clearly justified by the facts and essential to the resolution of an issue.

> 12.2  [Counsel] will commit to treat the representation of the client as the client's transaction, dispute or controversy, and not as a personal dispute with opposing counsel.

(http://www.cobar.org/index.cfm/ID/21435); *see also generally* C.R.P.C. 3.4, and 4.1.

on July 11th. (Exhibit O). The Parties were not able to meet the next day due to a medical emergency in Mr. Kerr's family. (Aff. Kerr ¶ 5). However, defense counsel forwarded the forensic report to Malibu Media on Saturday July 12th. (Exhibit H)

The Parties were finally able to confer the following Monday, where again Mr. Benson's counsel encouraged Malibu to participate in a status conference with the Court. (Exhibit G)(Aff. Kerr ¶ 6). Defense counsel further indicated that, while he did not believe a settlement agreement was ever created, there was an honest disagreement between the Parties and such concerns should be addressed by the Court, and that further, if Malibu still wanted to proceed with the polygraph and computer inspection it was free to do so. (*Id*.) In that conversation Malibu's counsel indicated he would talk to his client and then the Parties could seek a status conference with the Court. (Aff. Kerr ¶ 6).[8] The next communication came two days later when Malibu filed the instant motion for sanctions as well as the motion to lift the stay in which it formally repudiated the alleged settlement agreement. (Exhibit B)

As the record indicates, Malibu Media had numerous opportunities to confer with counsel and seek guidance from the Court as to whether a settlement agreement had actually been formed. Mr. Benson communicated to Malibu several times that if the Court found that an enforceable settlement agreement was reached, he would submit to the examination. (Aff. Kerr ¶ 6). Instead of participating in a short status conference with the Court to air the Parties' differences, Malibu Media chose to escalate the disagreement with a motion for sanctions. This is not reasonable. Neither can Malibu claim to have been prejudiced by not enforcing an alleged agreement that it has now affirmatively repudiated. Mr. Benson is happy to resume litigation. To mitigate any concerns, Mr. Benson would certainly stipulate to any continuance suggested by the Court or

---

[8] Mr. Kerr is also willing to submit his contemporaneous notes from that conversation for *in camera* review.

Malibu Media. Finally, Malibu Media is free to object to the cost of forensic examination after Mr. Benson has been awarded his fees and costs as the prevailing party. *See* 17 U.S.C. §505 (authorizing an award of fees to the prevailing party under the Copyright Act).

## VI. MALIBU MEDIA COMES TO THE COURT WITH UNCLEAN HANDS

First, Malibu Media's request for between $3000 and $5000 in fees is unreasonable. (Exhibit D) Based on the record, Malibu Media's total billable time spent between the June 16th settlement conference and the date it filed its motion consisted entirely of: 1) contacting the polygraph examiner; and 2) exchanging a handful of emails and phone calls with opposing counsel and presumably his client. (*See generally* Exhibits E, J and K) Under the most generous circumstances, Mr. Kotzker's time likely totaled, at best, a single billable hour. The remaining $3700 to $4700 can only be accounted for in Malibu's "fee's for fees" request for time spent drafting the instant motions. Put more plainly, Malibu's counsel spent approximately 10 to 17 hours drafting two separate motions to recover approximately one hour worth of fees. This fact alone undermines the reasonableness of Malibu's fee request..

Second, Defendant did not, and does not oppose Plaintiff's motion to lift the Court ordered stay. The issue was deliberated between counsel and the motion to lift the stay correctly indicates that it was unopposed. (Mot. Certification at 6) In point of fact, defense counsel previously prepared a request to lift the stay and asked Malibu's permission to file it with the Court. Malibu refused. (Exhibit P) Notably, Mr. Benson's request was only two sentences. (Exhibit Q) Malibu's decision to draft six (6) pages of legal argument for an unopposed motion to lift a stay was unnecessary and its claims for related fees unreasonable.

Third, Malibu Media's motion for sanctions against Mr. Benson and his counsel was filed for an improper purpose. Specifically, in a follow-up email sent to Mr. Benson's counsel, Malibu Media indicated that it would withdraw its motion for sanction only on the condition that Mr. Kerr

personally pay $1500 and agree to falsely confess on the record his alleged bad faith and vexatious actions. Specifically, under threat of sanctions, Malibu Media's counsel sought to compel Mr. Kerr to acquiesce to the following statement on the record:

> "*Please take notice, Plaintiff, Malibu Media, LLC ("Plaintiff"), hereby withdraws its Motion for Sanctions.  Counsel for defendant has admitted that the settlement agreement was breached by failing to produce his client for a polygraph examination and failing to deliver his computers to Plaintiff.  Further, although his actions have unnecessarily increased Plaintiff's costs to litigate this case, defense counsel compensated Plaintiff for the expenses incurred.*"

(Exhibit D). Malibu's motion and settlement demands -- made under threat of professional sanctions -- are meant to harass, intimidate and embarrass Mr. Kerr, as well as impugn his personal and professional character. Again, to be clear, Malibu's offer, as conveyed by counsel, is that it would withdraw its motion for sanctions against Mr. Kerr from the record, only under the condition that Mr. Kerr confesses to the motion for sanctions on the record. By using threats of professional sanctions as leverage to press unreasonable settlement demands, Malibu intended to intimidate Mr. Kerr into creating a false record to the clear detriment of his client's legal interests. This is wrong. *White v. General Motors Corp.*, 908 F.2d 675 (10th Cir. 1990) (allocation of sanctions issue presents clear conflict of  interests). Placing any counsel in that potential conflict is inappropriate and beneath the standards of the legal profession.

Additionally, Malibu Media's attempt to coerce Mr. Kerr into a making a false confession was clearly an effort to forestall the eventual award of fees and costs to which Mr. Benson will be entitled when he prevails in this case.[9] Malibu's manipulation of the record would naturally be used to undermine any later filed fee request by Mr. Benson. Malibu Media's unreasonable actions

---

[9] The Copyright Act authorizes the Court to "award a reasonable attorney's fee to the prevailing party as part of the costs." 17 U.S.C. § 505. In determining the reasonableness of requested fees, the following non-exclusive factors may guide a court's exercise of its discretion: "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Meshwerks, Inc. v. Toyota Motor Sales U.S.A., Inc.*, 528 F.3d 1258, 1270 n.11 (10th Cir. 2008) (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 n.19, (1994).

and demands demonstrate that its motion for sanctions was filed for an improper purpose. *See e.g.*, *Whitehead v. Food Max of Miss., Inc*., 332 F.3d 796 (5th Cir. 2003)(finding that an intent to embarrass opposition constituted sanctionable conduct); *see also* F.R.C.P 11(b)(1) (abuse of judicial process to present a motion for "any improper purpose, such as to harass…"). Mr. Benson respectfully asserts this type of litigation behavior may constitute unprofessional conduct prejudicial to the administration of justice in violation of Colo. RPC 8.4(d)) and Colo. RPC 3.1. *Cf*., *Williams v. District Court*, 700 P.2d 549, 554 (Colo. 1985)(construing the Colorado Code).

Fourth, Malibu's discovery efforts have not been unreasonably delayed. Approximately three months remain until the close of discovery. Mr. Benson has already answered all of Malibu's discovery requests. Further, he has indicated through counsel that after Malibu files an appropriate protective order he will withdraw the majority of his standing objections and provide supplementary responses. Noteworthy, is that Malibu's counsel has yet to answer a single request for discovery, nor has it noticed a single deposition. This Court is also aware of Malibu's own delays and lack of participation in discovery in this case. (Aff. Kerr ¶ 7-8)

## VII.  SANCTIONS ARE NOT JUSTIFIED AS A MATTER OF LAW

It is essential to maintain the line between vigorous advocacy and frivolous conduct. *District No. 8 v. Clearing*, 807 F.2d 618, 622 (7th Cir. 1986). Hair-trigger motions for sanctions by lawyers who do not recognize this difference are themselves sanctionable. *Foy v. First National Bank of Elkhart*, 868 F.2d 251, 258 (7th Cir. 1989). In *Nakash*, for example, the Southern District of New York explained precisely why courts must not entertain frivolous requests for sanctions:

> "[R]equests for sanctions necessarily carry with them accusations of wrongdoing on the part of an attorney, which can breed personal animosity between counsel. . . Memorializing attacks upon the competence or integrity or another lawyer in a [sanctions] request only reduces the opportunities for future cooperation…[such that] requests for sanctions must be treated seriously and controlled appropriately."

*Nakash v. U.S. Dep't of Justice*, 708 F. Supp. 1354, 1370 (S.D.N.Y. 1988). Malibu Media's request that this Court invoke its inherent powers is particularly unwarranted. Pursuant to its inherent power, "a court may assess attorney's fees [as a sanction] when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers v. NASCO, Inc.,* 501 U.S. 32, 45- 46, (1991)(internal quotations omitted). "In this regard, if a court finds that <u>fraud has been practiced upon it</u>, or that the <u>very temple of justice has been defiled</u>, it may assess attorney's fees against the responsible party. *Id.* at 46 (internal quotations omitted). "A court must . . . exercise caution in invoking its inherent power and it must comply with the mandates of due process, both in determining that the requisite bad faith exists and in assessing fees . . . ." *Id.* at 50. Moreover, "when there is bad faith-conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than its inherent power." *Id.*

There is no evidence on the record to support a finding of sanctionable conduct by Mr. Benson or his counsel as a matter of law. As demonstrated above, the proceedings were not unreasonably delayed nor was Mr. Benson's act of having his computer devices forensically examined done in bad faith or with an improper purpose. To that end, there is no evidence on the record to indicate a "fraud has been practiced" on the Court, or that the "very temple of justice has been defiled." *Id*. at 46. To the contrary there is ample evidence on the record that Malibu Media could have resolved this matter without resorting to the instant motion through good faith conferral with opposing counsel and minimal involvement by this Court. For these reasons this Court should deny the request for sanctions.

Respectfully submitted July 21st, 2014.

**SANTANGELO LAW OFFICES, P.C.**

/s/ David S. Kerr
David S. Kerr
125 South Howes St., 3rd Floor
Fort Collins, CO 80521
Telephone: 970-224-3100
Email: dkerr@idea-asset.com

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing RESPONSE was served by EFS and email on this 21st day of July, 2014, upon the following counsel:

> Jason Kotzker
> Kotzker Law Group
> 9609 S University Blvd., #632134
> Highlands Ranch, CO 80163
> jason@klgip.com

/s/ David S. Kerr